My name is Daniel Roth and I have the privilege of representing the objects in this case, the Center for Biological Diversity in the American Maricopa Audubon Society. With this court's permission, I would like to reserve three minutes for rebuttal. A decade ago, a former colleague of mine at our law school's Environmental Law Clinic also stood before this court arguing a case involving the U.S. Fish and Wildlife Service's policy on distinct population segments, or DPSs, under the Endangered Species Act. Her bias in the Northwest exists from Lyons v. the U.S. Fish and Wildlife Service, a decision of parties in this case that extends between their briefs. The court challenged the DPS policies for assessing the significance of a population to its taxon as a whole as focused too much on genetics. The court rejected that characterization of the agency's DPS policy, observing that, quote, the significance requirement may be satisfied not only by genetic differences, but also by the population's persistence in initial ecological settings. Its status as the only natural occurrence of a taxon, or evidence that its loss would result in a significant gap, close quote. The court therefore quoted the DPS policies for indicators that a population is significant to its taxon. Following this court's lead for years, everyone has believed that if at least one of these four indicators of significance applies to a given discrete population, that population will trigger a finding by the Fish and Wildlife Service that the population is significant to its taxon as a whole. And that's exactly how the Fish and Wildlife Service has implemented this policy for the past two decades. For example, in the agency's 2015 finding on sage-rooms, Fish and Wildlife Service asserted that, quote, a population needs to satisfy only one of these conditions, referring to the four explicit indicators of significance in its DPS policy, to be considered significant, close quote. Taking Fish and Wildlife Service at its word, the courts have refereed many battles over whether a population needs at least one of these four indicators of significance under the DPS policy. In numerous court cases involving disputes over the population status of the DPS, including several cases before this court, the parties have litigated over whether a population needs one of those four enumerated indicators of significance. So I thought, Mr. Ruff, let me interrupt you. I thought that there were four non-exclusive factors that were considered when you looked at any way significant. You could have all four in win, you could have all four in lose. But you're telling me once you get one, you win? That's correct, Your Honor. In fact, the agency, as I just noted, the agency has always applied its policy in saying that, again, here's the quote for its 2015 sage-rooms explicit decision. Quote, a population needs to satisfy only one of these conditions to be considered significant, close quote. Well, but that doesn't mean, as I said, it doesn't mean that if you satisfy one, that always means that you deserve to win. Sometimes if you satisfy one, that's a little trick. Actually, Your Honor, courts look to the Fish and Wildlife Service's listing of decisions over time to help it interpret the agency's DPS policy. And there's not one instance where the Fish and Wildlife Service has determined that a population inhabits a unique ecosystem, where the Fish and Wildlife Service has gone on to determine that that population is significant. So tell me more in common sense terms with respect to the policy, though, that you're interested in. Why in your field in the Fish and Wildlife Service, is that a mistake? Because, Your Honor, the agency simply disregarded its policy. It found that desert eagles inhabit an ecosystem that's unique for the species, and that is one of the four explicit indicators of significance that the agency has always applied to its policy. And the agency has always said, if a population meets one of these indicators of significance, you will find that it's significant. And the agency has not appointed to any other decision that the agency has made where it has made this sort of finding and still not found the population significant. Well, Your Honor, what you see can't be right in the way that you just said it. I think it's correct that where they are is a unique setting. I get that. And certainly, if the bald eagle existed only there, I would get it. And I think it would have been a misconstruction that it's possible that some species, whether I'm now talking generically, I'm not talking with respect to the bald eagle, that occupies a number of geographical areas, and some of those geographical areas are unique. But if it's the same species, it is actually very successful in lots of specific areas. The fact that it exists in this, among other places, unique area, doesn't mean that it's a sublisting for that population, does it? Well, Your Honor, that's really kind of the nub of this question. In fact, it's instructing to compare two of these sorts of situations. So there was another listing by the Fish and Wildlife Service or another consideration of a listing, this one involving sage-grouse, greater sage-grouse. And one of the things that the agency looked at in that citation, by the way, is AOD Federal Register 59858. One of the things the agency looked at, in that instance, was whether sage-grouse in the Columbia Basin inhabited a unique ecosystem. And the service looked over the range of greater sage-grouse generally and determined that sage-grouse inhabited a variety of conditions, and though the conditions in the Columbia Basin were somewhat different, this was an adaptable, wide-ranging species. And so the agency found, quote, although the Columbia Basin differs in some ways from other habitats that the greater sage-grouse inhabits, it is not unusual for the greater sage-grouse, range-wide in the diversity of sage-grouse habitat, the species utilizes the crossings range close by. And the service determined that the population did not inhabit a unique ecosystem and, therefore, was not significant to the taxon as a whole. Why is this case different from that? Because I agree with that. Why would you say that? Because this is the same. Well, Your Honor, it's very different because, based on the administrative record and based on the clear and consistent findings by the Fish and Wildlife Service biologists in Arizona, repeatedly over many years, actually, the Fish and Wildlife Service said, yes, bald eagles are habit to inhabit a wide variety of areas. However, this one is essentially unique for the species. It's so different. It's so hot. There's no other place where bald eagles nest in a desert. And so even though this species is a habitat generalist, this represents a unique ecosystem for the species. Now, the agency, if the agency believed that, in fact, this was not a unique ecosystem, the agency could have made the same finding as it did with respect to Columbia sage-grouse. So unique is not a word. When we're talking real estate, if we're talking total fashion contract law, any piece of real estate is unique. And, of course, the desert is not unique in some sense because it shares common characteristics with the rest of the landmass. It has mounds. It has dirt. It has sand. It occasionally has water. It has pipeline. So the question is not unique in some absolute sense. The question is, can we have difference? And I think the desert is very different. But unique is not a word. And I'm not sure how still to differentiate this case from the Columbia basin case. Well, Your Honor, you know, I agree. But the Fish and Wildlife Service developed this criteria, whether a population inhabits a unique or unusual ecosystem to a species. And that determination is, therefore, up to the agency to determine, based on its expertise, whether the ecosystem is or is not unique. And here we have a clear line. Because for Columbia sage-grouse, the Fish and Wildlife Service looked at the species and said it ranges across a wide variety of habitats, and the Columbia basin is not unique for the species. This is a slightly different question from the ground up to the question case in front of us. This population in the desert seems to be in the Fish and Wildlife Service, it seems to have an inclination that it's actually quite robust. How do you respond to that? Your Honor, that issue was not decided by the district court. And, you know, the government actually says this case, this whole appellate court should decide an issue that was briefed below and simply not even decided by the appellate court. I'm not a biologist, Your Honor. However, I do dabble a bit in that area in my teaching, and this population is actually very small. This population actually faces a number of habitat threats. In fact, the agency biologist in the agency's Arizona office made a draft determination that the population should be listed as a threatened species. That later was reversed by the agency's Washington, D.C. office, and the parties briefed that question extensively before the district court, which did not decide that issue. Mr. Roth, this won't come as a surprise to you. I think it's Rope 47 of the appellate rules. They have a way of saying, the Court of Appeals say, see low-reasoned opinion of district court. I like to see that in my work. Okay. And I went to the excerpts of record here, and I want to ask Judge Campbell's decision to see if I understand your argument here. Here's what Judge Campbell said. Plaintiffs argue that the plain language of this persistence factor should control if a population persists in an ecological setting that's unique or unusual for the species. This factor is satisfied and supports finding that the population is significant to the species as a whole. He drops down. Here's what he says, Judge Campbell. The court does not find that DPS policy should be read as rigidly as plaintiffs suggest. Isn't that the nullification? Yes, Your Honor. Okay. And in this case, we encourage this court to simply follow the U.S. Fish and Wildlife Service. Well, the reason I ask you that is he goes on to cite to the 61 that were registered, 4725, which is on enterprise scores. Here's what he says, Judge Campbell. He says the policy does not state that a population is significant merely because it persists in a unique ecological setting. Persistence is one of four significance factors identified in the policy, and the policy expressly states that the agency's analysis, quote, may include but is not limited to these factors. That's correct, Your Honor. Let's see. That's your argument. Yes. Your Honor, so this case actually provides a good illustration of the non-exclusive nature of those four factors. As I mentioned before, in the past, the Fish and Wildlife Service has explicitly said, and parties have litigated over this in probably dozens of cases, if one of these four numerator factors is met by a population, we say it's significant. And so parties, this court has entertained questions. We can say it's significant, or we must say it's significant. Those are very different concepts. The agency itself has specified that it will say a population is significant if the agency finds one of those factors met. You're way down on time. Yes, Your Honor. We'll hear from the other side, and then we'll give you a chance to respond. Thank you, Your Honor. I'm going to take this phone off while I make sure you answer this. Okay. Because you need to see it right now. May it please the Court, I'm Mark Hayden from the Department of Justice with the Fish and Wildlife Service. I guess before we get into the meeting greeting, I'd like to step back a little bit to talk about the overall legal framework here, because there are a couple of issues there that I think are also important. The first is that the agency's decision here not to list the Sonoran population of eagle citizens as DPS does not mean that the eagle will not be protected under federal law or under state law. The eagle continues to be protected under the Baldwin-Gauldin Eagle Protection Act, the Migrant River and Treaty Act, the Southwest Bald Eagle Management Committee, the Arizona Listing Monitoring Provisions. So there are a lot of other provisions in place. Listing the species as endangered under the ESA is kind of like is the wildlife law equivalent of sending something to the intensive care unit. And the fact that the eagle is no longer in the intensive care unit does not mean it is not protected and worthy of protection. Second, in talking about significance here, I want to be clear, and I think the Court understands what I want to emphasize, is that we're talking about significance in a narrow legal technical sense for purposes of the distinct population segment policies. We're not talking about whether the eagle is of value. It tries the Southwest in particular, but it's not of cultural significance to use the single word on the eagle. This decision has nothing to do with it. It's separate from that. It's distinct from that. And so the thing that bothered me the most about this case is the history. And one could come away with the impression that there had already been a decision in the highest political circles as to what the outcome of this case would be if orangey borders were given for the issue of wildlife service to come to its conclusion. What's your response to that? A couple of responses. First, the inspector general's office investigated those allegations of orangey borders and found, and it's in our record we cited in our brief, that there was no evidence of improper political influences between Julian McDonnell Was there evidence of proper political influence? No, there was no evidence of that either. There was a dispute between, thank you, there was a dispute within different levels of the department as to how to approach this species, as to what the facts should be. Second, Well, I have to say there was a period during which the Democrats proposed to intervene in a number of environmental disputes. I'm thinking, for example, of the Klamath River basin and the water coming down out of there. I mean, the suspicion does not come out of nowhere. No, that's certainly true. And the inspector general's report addresses, goes through, I think, 20 some odd cases and identifies cases where there was political influence or the people involved thought that there was political influence. And it determines that this is not, that there was no political influence here, that Julian McDonnell was not involved. But the second part of your question is when the case was remanded, which is, for example, remanded the decision a second time in 2011 with the Fish and Wildlife Service's analysis of the issue of the facts on remand was assigned to a different team of career people. So a new group of scientists, biologists, looked at this, and the 2012 decision that's on review here was made by a different group. Were those newly assigned scientists aware of all of the emails and all of the correspondence and all of the extremists that had taken place historically in this case? It works. Yes, because it works on the same record. I mean, I don't know whether each of them read all of them. They were exposed. They were exposed, certainly. Certainly. Mr. Hick, I didn't understand for the record why the judge can't vote. He said he sent it back for notice and comment. Was there evidence taken? He wasn't pleased with the record when it came to him the first time. Why? But I didn't understand why. Did the agency not comply with it? I think it was a procedural problem, and I'm going to look implicitly blanking on this a little bit. What procedure? The agency relied on aspects of its 2008 decision, and I have proof that Julia had designed it more procedurally and properly. And so instead of doing nothing, the court decided to do nothing. And Judge Campbell directed the agency to specifically address this issue of whether the agency was being inconsistent in its application of the policy and the agency did that as well. And that's in our supplemental excerpt. Well, Judge Murphy is concerned that initially the agency came out one way and then it came out a different way and then there was no notice or comment on a different outcome. That was what I thought. Sorry, Your Honor, my skin is so full of species, I'm not on the procedural approach that you're describing. Thank you. So I've been talking about whether this decision is consistent with the policy or not. I think the court's questions reflect that you are familiar with the policy and that the way that the policy is written, it may consider its holistic potential factors that are not mandatory. Counsel, do you agree or disagree with the opposing counsel's position that in the history of applying this regulation that any time there was one of the families present that there had been a finding of the same population? Do you disagree with that? I do disagree with that, Your Honor, and I put a finer point on it than that when I'm identifying three species, the mountain whitefish, the Arctic grayling, and the northern Rocky Mountain population of the fisher, all of which I discussed in the supplemental excerpts and I can give federal register sites as well. But those are all species where the agency said this habitat is unusual or endangered, but it's not unique enough or unusual enough that it is biologically significant. And the mountain whitefish is a really interesting example of this. It's the lost big river population of mountain whitefish, and federal registers would say there's 75, 17352. The mountain whitefish on the Big Lost River is an isolated drainage. And for 10,000 years, those whitefish have been in a drainage where there are no bigger, large fish. They don't have to compete with drought or sometimes there's no other drainage like that of mountain whitefish. And so in that sense, it is a traditionary definition of unique. There's nothing else like it. However, the agency found that there was no indication that this had any biological significance because once the trout were introduced into that system 100 years ago, there was no apparent effect on mountain whitefish. So, Pastor, what did you say we may call to the ends of the record to find these three examples? There's a memo discussing the history of the application of the DPS policy. That's the sole document that's in the United States Supplemental Inserts of Records. It's SCR 5 and 6 is where the whitefish is discussed. The Meridian Grayling is discussed in SCR 7. The Fisher is discussed in SCR 4. And then the Federal Register Sites are not in the SCR, but these are the listings that the memo is discussing. The alternative rating that the appellates are raising here introduces this absurd result that the inconsistent were the purposes of the policy. The absurd result, and I think just that you alerted completely to this point of your question, is that any time you have an isolated, a distinct population, an isolated population of some species, it has to be listed. So the example that Congress discusses in the Senate Committee Report that's cited in the DPS policy discusses is squirrels in a seaport. It's an isolated population, but it's of no significance to the population as a whole. Another example would be in Queens, where I'm from, and in Chicago there are populations of monk parrots, and the monk parrot is a subtropical species from South America, but they build nests on telephone poles in Queens and in apartment house airships in Chicago where there's nothing useful to describe. Under CBD's rating of this policy, the fact that that population is distinct would trigger a finding that it's significant, and that's not the goal of the app. The goal of the app is to preserve important genetic diversity. The agency has a backlog of cases of species and issues a list every year of all the species that it thinks are warranted for listing, but precluded because it doesn't have the resources to get to them, and there are about 50 species on that list as of right now. So if the agency has to devote its resources to species that it thinks don't have genetic significance or biological significance to the taxon as a whole, that has real consequences for these warranted but precluded species that the agency thinks are in protection, but the agency is not able to get to. I understand the nature of this list. It does have a backlog of cases involving the backlog, but I don't see how changing the criteria, as you say the criteria would be changed, would affect the backlog. I mean, you've got to apply different criteria, but you just apply different criteria. If any time the agency finds that a species is in an unusual place, it has to find that it's significant. Well, then that makes it easier. You can clear your backlog more easily. It just doesn't do it. It doesn't list it at all. Well, once it's listed, there are consequences of that. So the agency has to designate who's going to have a tab. The agency has to prepare a recovery plan, and all of those things impose burdens on the agency, too. Congress, in the legislative history, and the agency in the policy, focus on the word that's used in the legislative history is sparingly. The DPS policy should be used sparingly. Focusing on the species that are of the most biological concern or the population segments that are of biological significance is the way to describe those policy issues sparingly, and consistent with the purposes of the statute. If there are no further questions, I will sit down. Thank you. Thank you. Why don't you go to ten minutes on the clock. Your Honor, we respectfully believe that counsel for the government's characterization of the Fish and Wildlife Service's listing decisions are not quite accurate. So I think if you looked at the species that were referenced, the Fish and Wildlife Service actually did not find that those populations inhabit an ecosystem that is unique or unusual to the species, and therefore find that those populations were not significant. In fact, that has not happened. And so the array of horribles that counsel presents where squirrels and a sea turtle be listed is not the case. It's only if the Fish and Wildlife Service, in using its discussion, finds that a population inhabits an ecosystem that is unusual or unique to the species. The absurd situation that would be created, Your Honors, under the government's interpretation, brand-new interpretation, by the way, of its DPS policy is that the court and the agency may then as well throw out the policy. Because for the last 20 years, the agency has said, if a population meets one of these criteria, it's significant. Now the agency is saying significance is whatever we say it is. It can meet one of these criteria. It cannot meet one of these criteria. It's whatever we say it is. Counsel, both of counsels rely on the broad discretion that's given to the agency in the overall statement of the regulation. What's your response to that? My response to that, Your Honor, is the DPS policy was precise as the agency's effort to explain to everyone, including itself, how it would use its discretion and how it would define a distinct population segment. So that policy very carefully enumerates indicators of significance. But does that mean that the agency can never exercise its discretion in a different way? The agency could if it changed its policy and acknowledged it was changing the policy and said, now we're going to look at significance in a different way. And, in fact, that's precisely what virtually all Fish and Wildlife Service personnel in Arizona, including the Fish and Wildlife Service Region 2 Director, sent a memorandum, which we cite on page 11 of our opening brief, to the Washington, D.C., office and said, hey, you guys are changing the DPS policy by saying that Desert Eagles don't need the policy even though they live in a unique ecosystem, and that's fine if you want to do that, but we think we should notify the public. So even the Fish and Wildlife Service itself agrees with the position that my clients take in this case. Mr. Trump, it was in your 28-J letter that you sent Judge Paius's opinion. Assistant Administrators for Fisheries, National Oceanic and Atmospheric Administration. Did you say that? Yes, sir. Because one thing you haven't talked about that I was interested in is you claim the language of the brief that the agency didn't address climate change. I think that's what Pritzker is about, the case you sent, right? That case does address climate change, Your Honor, and, yes, we did. One of our arguments is, indeed, that the agency personnel in the region in the draft findings addressed climate change, but the final significance determination did not consider that at all. Here's what the District Judge said. It is discussed at length above the 2012 finding. That's correct. We are reviewing it. Yes, Your Honor. It is discussed at length above the 2012 finding, considering carefully whether the Desert Eagle has adapted to the desert environment in ways that would help bald eagles generally, despite no evidence that it has. This inquiry essentially answered the question posed by Plaintiff's climate change argument, whether Desert Eagles have unique characteristics that could help bald eagles as a whole in the era of global warming. Given this detailed analysis of adaptation in the 2012 finding, the court cannot conclude that the finding is strangely flawed. Didn't they discuss and reject climate change as a significant factor? No, Your Honor, climate change was never mentioned. All of the issues that Judge Campbell discussed was Judge Campbell's efforts at sort of being an amateur biologist to say, this is why desert eagles won't be important to the population as a whole if given climate change. How many sites to the Adventist Reader Record in 2012 are potentially going to do it? Your Honor, if you look at the final finding, nowhere in the significance discussion, absolutely nowhere, does the Fish and Wildlife Service discuss climate change? So that was specifically posed to my own reasoning by Judge Campbell. Thank you. Thank you. Thank you. Thank you. Those are all the questions we have. Are any helpful? Are any of these questions useful? In the case of the Center for Biological Diversity versus the Zoo, I know it's a different decision. The next case on the calendar this morning, we have all the founders of Svetsky Insurance versus Calix.
judges: W. Fletcher, Rawlinson, Pratt